OPINION OF THE COURT
John M. Curran, J.
This special proceeding seeks court approval of a proposed transfer of structured settlement payments from the payee, Jenny Lemanski, to the transferee, 321 Henderson Receivables, L.E This application is made pursuant to the Structured Settlement Protection Act (SSPA) (General Obligations Law § 5-1701 et seq.).
321 Henderson initially applied to approve the transfer pursuant to a notice of petition filed April 28, 2006. The application was returnable before the court on June 8, 2006. At that time, counsel for 321 Henderson and counsel for Lemanski appeared. Lemanski also appeared in person. During oral argument on the application, counsel for Lemanski, with the consent of counsel for 321 Henderson, authorized his client to address the court on her own in support of the application. Lemanski’s statements were therefore not made on the record because they were part of oral argument. The court rendered its decision on the record denying the application. An order denying the application has been granted and entered.
Lemanski thereafter moved to reargue and renew the petition by notice of motion dated June 22, 2006. The court heard oral argument on July 13, 2006 in support of the application. The court also heard testimony on the record from Lemanski. Lemanski offered six exhibits which were received in evidence.
Structured settlement arrangements to effectuate the resolution of personal injury actions have become commonplace since Congress amended the Internal Revenue Code in 1983 to authorize the exclusion from taxable income of periodic payments for personal injury damages (Internal Revenue Code of 1954, 26 USC § 1 et seq., as amended by Pub L 97-473, 96 US Stat 2605). During the early 1990s, an active secondary market developed with respect to the purchase of structured settlement payment rights by so-called “factoring companies” (Hindert & Ulman, Transfers of Structured Settlement Payment Rights: What *528 Judges Should Know about Structured Settlement Protection Acts, 44 [No. 2] Judges’ J 19 [Spring 2005]). Aggressive marketing by these factoring companies, fueled by the intense competition among them, caused a number of state legislatures to enact protections against the abuses of factoring (Hindert & Ulman, supra). Philip H. Corboy, a nationally known plaintiffs attorney, also drew attention to these abuses in the American Bar Association Journal and encouraged the adoption of similar statutes in other states (Corboy, Structured for a Reason, 86 ABAJ 116 [June 2000]).
Congress elected to support these state efforts through enactment of section 5891 of the Internal Revenue Code in 2001. Under that statute, a 40% excise tax is imposed on any party that acquires payment rights in a structured settlement without obtaining a “qualified order” from a court authorizing the transfer (Internal Revenue Code [26 USC] § 5891 [a]).
In July of 2002, New York enacted the SSPA. The legislative history of the SSPA evidences the Legislature’s concern about “a growing number of factoring companies [using] aggressive advertising, plus the allure of quick and easy cash.” (Assembly Mem in Support of L 2002, ch 537, 2002 McKinney’s Session Laws of NY, at 2036.) The public policy underlying the SSPA was to protect the long-term financial interests of injury victims and to minimize the hazard “to the public assistance programs” on which “recipients [of structured settlement payments] must often rely” {id.). The Legislature declared that transfers should be limited “to true hardship cases” {id.).
The SSPA was amended in 2004 to clarify the Legislature’s “original intent” that “a court need not find economic hardship before” it approves the transfer of a structured settlement payment (Mem of Off of Ct Admin, 2004 McKinney’s Session Laws of NY, at 1967, 2205). The legislative history of this amendment also contains the following:
“An adult who has not been adjudicated incompetent or incapable of handling his or her own affairs is generally capable of determining what is in their own best interests with regard to their property and affairs, including their structured settlement payment rights, without having to demonstrate or prove ‘hardship,’ provided the consumer has been afforded the admonitions to consult with counsel, the rights of cancellation, and the disclosures required by the 2002 Act” (Assembly Mem in Support of L 2004, ch *529 480, 2004 McKinney’s Session Laws of NY, at 1968).
As of July of 2006, 46 states have enacted structured settlement protection statutes largely styled after the model Structured Settlement Protection Act developed by the National Structured Settlement Trade Association (Hindert & Ulman, supra).
The SSPA requires that certain procedural and substantive safeguards be followed before a structured settlement payment may be transferred. The procedure is set forth at General Obligations Law § 5-1705. The procedure includes that a copy of a disclosure statement as required under General Obligations Law § 5-1703 be attached to the petition and that proof of service upon the payee be provided.
Before a transfer may be effectuated, the court’s order must contain the “express findings” detailed by General Obligations Law § 5-1706. No structured settlement payment can be effectuated in the State of New York unless a court of competent jurisdiction has made each and every finding expressed in the statute. This statute therefore requires a case-by-case analysis of each application and that every court confronted with such an application conduct a sufficient inquiry in order to make the requisite findings, or deny the petition.
The SSPA itemizes five such “express findings.” First, the transfer must comply with the requirements of the SSPA. In order to comply, the procedure set forth in section 5-1705 must be adhered to and the disclosure required by section 5-1703 must have been properly provided. The disclosures required by section 5-1703 are important because the Legislature has therein set forth the factors it deemed relevant to the economic evaluation every payee should undertake when considering a transfer. The evaluation includes comparing the proposed transfer to calculations involving the applicable rate and the cost of purchasing an annuity to produce the same amount of structured settlement payments which the transferee seeks to purchase.
The next finding, which also is the most significant, is whether the transfer “is in the best interest of the payee, taking into account the welfare and support of the payee’s dependants,” and whether the transaction is “fair and reasonable” (General Obligations Law § 5-1706 [b]). There are numerous decisions from New York State trial courts addressing these two separate, but interrelated factors (Matter of Settlement Funding of N.Y., LLC v Kiezel, 12 Misc 3d 1155[A], 2006 NY Slip Op 50900[U] [Sup Ct, Suffolk County 2006]; Settlement Funding of *530 N.Y., LLC v Brown, 11 Misc 3d 1059[A], 2006 NY Slip Op 50286[U] [Sup Ct, Bronx County 2006]; Matter of 321 Henderson Receivables L.P. v Martinez, 11 Misc 3d 892 [Sup Ct, NY County 2006]; Matter of 321 Henderson Receivables L.P. v D’Amore, 9 Misc 3d 1110[A], 2005 NY Slip Op 51479[U] [Sup Ct, Kings County 2005]; Matter of Settlement Funding of N.Y., 1 Misc 3d 910[A], 2003 NY Slip Op 51638[U] [Sup Ct, Ontario County 2003]; Matter of 321 Henderson Receivables Ltd. Partnership, 2 Misc 3d 463 [Sup Ct, Monroe County 2003]; Matter of Settlement Funding of N.Y., 195 Misc 2d 721 [Sup Ct, Rensselaer County 2003]; Matter of Settlement Capital Corp., 194 Misc 2d 711 [Sup Ct, Rensselaer County 2003]). This court is unaware of any appellate decisions from New York addressing these two factors or the approval of a transfer.
The third finding which must be made is with respect to the requirement that the payee either receive or waive independent professional advice. This phrase is defined in section 5-1701 and essentially requires that the professional who renders the advice about the proposed transfer be completely independent of the transferee.
The fourth finding must be that the transfer does not contravene any applicable statute or other court order. The fifth finding requires that the transfer be in plain language and otherwise comply with section 5-1702.
Unlike statutes where the Legislature has provided some definition of the factors to be considered when evaluating the “best interest” of an individual before the courts (see e.g. SCPA 1750-b [2] [b]), the SSPA contains no such particulars. A number of trial courts have employed a set of factors to be considered when evaluating whether the sale of a structured settlement payment is in the best interest of the payee (Settlement Funding of N.Y., LLC v Transamerica Annuity Serv. Corp., 11 Misc 3d 1061[A], 2006 NY Slip Op 50332[U] [Sup Ct, Bronx County 2006]; Matter of Rapid Settlements Ltd., 6 Misc 3d 1030[A], 2004 NY Slip Op 51844[U] [Sup Ct, Cortland County 2004]; Matter of Barr v Hartford Life Ins. Co., 4 Misc 3d 1021[A], 2004 NY Slip Op 50980[U] [Sup Ct, Nassau County 2004]; Matter of Settlement Funding of N.Y., 2 Misc 3d 872 [Sup Ct, Lewis County 2003]; Matter of Settlement Capital Corp. [Ballos], 1 Misc 3d 446 [Sup Ct, Queens County 2003]). In this way, the trial courts have followed the example of family law cases where factors have been established to define the best interest of children under various circumstances (see e.g. Matter *531 of Wilson v McGlinchey, 2 NY3d 375 [2004]; Matter of Tropea v Tropea, 87 NY2d 727 [1996]; Eschbach v Eschbach, 56 NY2d 167 [1982]). As in the family law cases, the Legislature here has not provided any precision for the definition of the best interest of a payee under these circumstances and therefore has neither limited the courts to specific factors nor prohibited them from employing such factors. The courts should therefore employ a “totality of the circumstances” test similar to what is used in family law matters (see e.g. Eschbach, 56 NY2d at 174).
The trial courts also have recognized the interplay between the best interest standard and the fair and reasonable standard. As one court observed: “The more pressing the need, the more reasonable it may be for a payee to obtain immediate cash at a steep discount rate” (Matter of 321 Henderson Receivables Ltd. Partnership, 2 Misc 3d at 465). This is not to say, however, that the courts are authorized to impose an absolute rule based on extreme hardship, exigent circumstances or an extraordinary change in circumstances. The 2004 amendment to the SSPA makes this clear. The ultimate point, of course, is that the SSPA is a “paternalistic statute” requiring the courts to engage in a fact-based inquiry and not merely serve as a “rubber stamp” (Johnson v Structured Asset Servs., LLC, 148 SW3d 711, 729 [Tex 2004]; In re Transfer of Structured Settlement Rights by Spinelli, 353 NJ Super 459, 467-468, 803 A2d 172, 177-178 [2002]; Matter of Settlement Capital Corp [Ballos], 1 Misc 3d at 461).
Lemanski is presently 21 years of age and is the single mother of two young children, both of whom are presently under the age of three. Lemanski was injured in a fall when she was approximately two years of age. On Lemanski’s behalf, her mother instituted a lawsuit against the responsible party which was settled in May of 1989. The payments required under that structured settlement are as follows:
a. $15,000 on January 2, 2003;
b. $15,000 on January 2, 2004;
c. $15,000 on January 2, 2005;
d. $15,000 on January 2, 2006;
e. $135,000 due on January 2, 2010;
f. $200,000 due on January 2, 2015;
g. $250,000 due on January 2, 2025;
h. $350,000 due on January 2, 2035.
According to this payment schedule, Lemanski has already received $60,000 since January of 2003. In addition, Lemanski *532 received, approval from this court in December of 2005 to sell a portion of the payment due on January 2, 2010. At that time, the court granted approval for the sale of the payment of $85,000 due on that date so that Lemanski could purchase a home for herself and her two children, one of whom had been recently born.
Lemanski has now returned to court just five months later in an effort to sell $125,000 in future payments due on January 2, 2010 ($50,000) and January 2, 2015 ($75,000). In exchange for the sale of those two payments, Lemanski would receive the net amount of $51,500.
Lemanski testified that she wants to sell the structured settlement payments because she and her fiancée, Jamie Dombrowski (who also is the father of the two children), “desperately need” to purchase more equipment for their recently inaugurated landscaping and snow plowing business. Lemanski testified that she used some of the funds advanced to her in December of 2005 to purchase equipment for this landscaping business so that she could take over some contracts from her sister’s landscaping/snow plowing business. Lemanski purchased a truck, a snow plow and a lawnmower. Lemanski further testified that she and Dombrowski presently have 37 contracts for lawn service and they wish to buy new equipment to expand their business.
The record reflects that Lemanski and Dombrowski started this business in March of 2006. Lemanski claims that the equipment she purchased earlier this year to start the business is decrepit and admitted that, at least with respect to the truck she purchased, it was a “mistake” because the truck has too many miles and it needs too many repairs.
Lemanski claims that this new business can generate annual income of at least $30,000. However, during her testimony, Lemanski admitted that the business has so far only shown a profit of a few hundred dollars. Moreover, Lemanski has no personal experience in the landscaping business. Dombrowski worked for Lemanski’s sister’s landscaping business part time for a couple of years, but is 19 years of age and graduated from high school just two years ago.
Lemanski’s application also sought to use some of the funds to be transferred for her wedding planned in June of this year. However, the wedding was cancelled due to an illness to one of Dombrowski’s family members. Lemanski attests that she and Dombrowski plan to be married in October of this year.
*533 Before commencing the landscaping business four months ago, Lemanski worked for Toys R’ Us on a full-time basis earning approximately $16,000 per year. Additionally, Dombrowski worked full time for a local bakery doing freezer work and earned, together with his part-time employment in the sister’s landscaping business, approximately $24,000 per year. Lemanski failed to explain why she and Dombrowski would relinquish approximately $40,000 in annual income to be replaced by the possibility of having an annual income of $30,000 per year.
During her testimony, the court observed Lemanski to be quite young and immature. She also seemed to fail to appreciate the incredibly deep discount she was getting on her money through the sale of the structured settlements and did not seem to care that this money would be extremely valuable to her and her children in the future. Lemanski also fails to appreciate the harsh realities of starting a small business, particularly in Buffalo, and that most such small businesses fail within a relatively short period of time.
The papers reflect that the present value of the payments to be sold (5.60% discount rate at the time of the application) is $87,467.19. Lemanski would receive 58.94% of this present value, thereby rendering an effective annual discount rate for the transaction of 15.16%. Additionally, a quote from Prudential Insurance Company of America reveals that the cost of purchasing a comparable annuity for the aggregate amount of payments to be transferred would be $94,395. Lemanski would receive only 54.55% of this amount.
In determining what is “fair and reasonable” under the SSPA, the courts have struggled between the indisputable fact that any such sale is always at a “punishingly high” discount (321 Henderson Receivables Ltd. Partnership, 2 Misc 3d at 465) and whether the proposed discount is within the range of reasonableness when compared to the overall marketplace. Because this court agrees with Justice Siracuse in 321 Henderson Receivables Ltd. Partnership (2 Misc 3d 463) that all of these transactions are economically unwise, it would make no sense for any court to undertake a subjective analysis of whether these transactions strike a particular judge as “fair and reasonable” according to his or her own economic predispositions. Rather, the analysis for determining what is fair and reasonable under the SSPA must be based on what is reasonable within the range of the marketplace. The disclosures that are required to be provided to the payee concerning the applicable federal rate, *534 present value, total aggregate amount, and cost of a comparable annuity all corroborate this perspective. So, too, does the 2004 legislative history. While Justice Satterfield in Bollos recognized that at least one law review author believes that statutes similar to the SSPA have and will continue to make the marketplace more favorable to payees, the recent evidence before the courts and the discount rates reflected in all of the trial court decisions reviewed by this court do not support that view (Scales, Against Settlement Factoring? The Market in Tort Claims Has Arrived, 2002 Wis L Rev 859 [2002]). Nevertheless, the evidence before the court on this application is that the amounts offered by the transferee are comparable to those offered by other companies in the industry and are therefore within the range of the marketplace.
The fair and reasonable test should not be governed solely by whether the amount offered is within the range of the marketplace, but also weighed against whether the transaction is in the best interest of the payee. Under the facts before this court, this transaction is clearly not in the best interest of Lemanski or her dependents. In fact, it is so against her interest at this time that the fairness and reasonableness of the amounts offered by the transferee is entitled to only minimal weight. Thus, while the court finds that the amounts offered by the transferee are fair and reasonable because they are within the range of the marketplace, the application cannot be approved because the transfer is not in Lemanski’s best interest.
Based on the foregoing, the motion for reargument is granted so as to have afforded Lemanski the opportunity to testify under oath and on the record. However, because no new evidence was provided, the motion for renewal is denied. Further, upon reargument, the court adheres to its initial decision and will dismiss the petition upon a judgment to be submitted by the transferee’s counsel.